**Glen W. IVES, Jr., Appellee,**

**v.**

**SWIFT & COMPANY, a Corporation, Appellant.**

**No. 54352.**

Supreme Court of Iowa.

Jan. 19, 1971.

Rehearing Denied March 9, 1971.

Paul W. Deck and Robert J. Larson, Sioux City, for appellant.

Gleysteen, Nelson, Harper, Kunze & Eidsmoe, Sioux City, for appellee.

STUART, Justice.

Plaintiff brought this action for damages against Swift & Company to recover for personal injuries sustained when he stepped into a "hot well" tank on its premises and was severely burned. The jury returned a verdict in favor of plaintiff for $50,000, the amount asked. Defendant has appealed.

Plaintiff, a chemical engineer, is technical director for Iowa Beef Packers (I.B. P.). I.B.P. had arranged to purchase blood from Swift for use in its dry animal feed operation. It was to pick the blood up at Swift's Sioux City plant. Robert L. Peterson, an I.B.P. vice president, told a Swift official that someone from I.B.P.'s management would come with the first truck to see that all details were handled, the operation came off smoothly and a proper analysis of the blood was obtained. Plaintiff was selected to take samples of the blood and "to evaluate the project in an overall sense". Peterson testified: "We wanted to see the kind of facilities we were getting involved with so that in the event there was any problem in the future, that our people would be able to discuss them with the management of Swifts. He was to look over the facilities at Swifts that they would come in contact with in order to get this blood."

When plaintiff arrived at Swift's plant on September 27, 1967 in a truck driven by Kyle Dykstra, they were passed through a guarded gate. Mr. Koeppel, supervisor of rendering operations at Swift's plant, directed them to the loading area. The

truck was backed into loading position beneath the loading pipe which extended from the west wall of the building across the "hot well" tank near its north end. The tank was constructed of cement and was about four to four and one-half feet high and 46 feet long. A rough plat is included to help visualize the scene.

Koeppel climbed on the tank-trailer, inserted a loading hose and signaled a man in the building to start the pump. After failing to attract the pump operator's attention, he climbed down from the truck and walked around the south end of the building and entered a door on the south side.

Ives followed to ask him where a restroom was located. When Ives reached the door on the south side, Koeppel was not in sight. He decided to return to the truck and wait for Koeppel's return. He intended to climb onto the trailer from what he thought was a loading dock, but was, in reality, the "hot well".

The hot well is used to retrieve grease in the rendering operation. Hot water and steam carrying grease are discharged into the tank near its north end. The grease comes to the top and forms a crust. The hot water empties into a sewer. The grease is skimmed off the top near the south end of the tank. The sides of the tank were about eight inches higher than the surface of the crusted grease.

Ives reached the south wall of the tank by walking along the west side of the building, mounting a wooden platform and taking an "easy step" from there onto the wall of the hot well. He testified: "As I was walking across the wooden structure I could see what lay ahead of me, which was the wooden structure, this space or gap, and then what appeared to be a concrete surface which was somewhat lower than the sides of this concrete wall; approximately eight inches or thereabouts lower, which was an easy step down."

On cross-examination he testified: "I know I stopped and looked. I know I viewed the surface. I can't tell you exactly at what point it was I did stop and look. I did take a careful enough look to know I thought that was concrete. I can't tell how far down the dock I looked. I am sure I looked at more than the one-step area in front of me. I do remember steam being in

the vicinity. As I recall, it was on ahead of me in the area of the truck. * * * "

As the mixture of water, steam and grease was discharged into the tank, it created a cloud of water vapor over the north end. Plaintiff did not realize what was causing the cloud. He testified: "There was an operation going on along the side of this building which released a fog cloud into the air and visibility was obscured in the vicinity of the truck, which was some distance ahead of me, but I could see quite clearly most of the way to the truck."

On cross-examination he added: "It is not uncommon or unusual to see a water vapor cloud around a packing plant, and they don't represent a hazard to me. I don't consider it a hazard in itself. I have been in the midst of these clouds and they are not hot. There is a distinction between steam and water vapor. This could be described more as a cloud of fog."

The following quote is a succinct statement of what happened. "The surface of this hot well appeared to be concrete. It wasn't hot; it was colored, scummy and crusty. I determined it was concrete before I stepped onto it. I took one step and learned better. It would not support my weight."

Plaintiff's entire body with the possible exception of his head was submerged into this hot mixture and he suffered severe and extensive burns.

I. The trial court submitted the question of the status of plaintiff on defendant's premises to the jury. Defendant claims that as a matter of law plaintiff exceeded the scope of his invitation and was therefore not a business invitee at the time and place of his injury. Wilson v. Goodrich (1934), 218 Iowa 462, 467–469, 252 N. W. 142, 144–145.

The trial court was correct in letting the jury determine whether plaintiff was exceeding the scope of his invitation at the time of his injury. The pipe through which the blood was to be transferred to the truck extended across the hot well tank at its north end. The truck was backed up against the tank. Plaintiff on returning from the building stepped into the tank at the south end. He planned to step from what he mistook for a loading dock onto the trailer where the loading was taking place. We cannot say, in view of the broad purpose of his business visit that he exceeded the scope of his invitation as a matter of law by being at the south end of the tank. Sullivan v. First Presbyterian Church (1967), 260 Iowa 1373, 152 N.W.2d 628; Holmes v. Gross (1958), 250 Iowa 238, 93 N.W.2d 714; Nelson v. F. W. Woolworth & Co. (1930), 211 Iowa 592, 231 N.W. 665.

The facts here are different from those in Wilson v. Goodrich, supra. That case would have been comparable if plaintiff's injury had occurred while he was wandering around inside the building looking for a restroom. Here the injury occurred in the vicinity of the portion of the premises to which plaintiff had an unquestioned invitation. It was proper to allow the jury to determine whether the scope of the invitation was exceeded by his presence there.

As we have decided the issue adversely to defendant on the merits, we need not decide whether the alleged error was properly raised below.

II. Defendant claims the facts here, as a matter of law, do not support a finding that it failed to exercise reasonable care to make the premises reasonably safe for plaintiff's use for the purpose of the invitation in that it had no duty to anticipate that a reasonable man would not see the conditions as they existed and appreciate the danger they presented.

The trial court treated the issue as one of foreseeability. Defendant views the matter as one of the primary negligence of defendant under the rule set out in section 343, Restatement, Second, Torts, which provides: "A possessor of land is subject to liability for physical harm caused to his

invitees by a condition on the land if, but only if, he

"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

"(c) fails to exercise reasonable care to protect them against the danger."

Plaintiff supports the trial court's position and responds to defendant's argument also. In our opinion the questions overlap and both are involved.

■ A. Under our cases "it is sufficient to constitute negligence that the person charged should have foreseen his act or omission would probably result in injury of some kind to some person—he need not have foreseen the particular injury that resulted". Kaffenberger v. Holle (1946), 237 Iowa 542, 547, 22 N.W.2d 804, 807, and citations; Priebe v. Kossuth County Agricultural Assn., Inc. (1959), 251 Iowa 93, 100, 99 N.W.2d 292, 296; McGrean v. Bos Freight Lines (1949), 240 Iowa 318, 322, 36 N.W.2d 374, 377.

When this rule is applied to all the facts and circumstances of this case, we believe a jury question was raised as to whether defendant should have foreseen that the construction of a cement vat of this size, shape and height at a location where invitees would be present to load tank trailers of blood would probably result in some injury to some person when it contained a hot substance with the deceptive appearance of solidity, in the absence of warnings or protective measures of some kind.

B. In Hanson v. Town & Country Shopping Center, Inc. (1966), 259 Iowa 542, 546–549, 144 N.W.2d 870, 874–875, we approved of sections 343 and 343A Restatement, Second, Torts. Since that decision we have attempted to apply section 343 to varying factual situations. Capener

v. Duin (Iowa, 1969), 173 N.W.2d 80, 83–85; Weidenhaft v. Shoppers Fair (Iowa, 1969), 165 N.W.2d 756, 759; Knudsen v. Merle Hay Plaza, Inc. (Iowa, 1968), 160 N.W.2d 279, 282; Chevraux v. Nahas (1967), 260 Iowa 817, 822–823, 150 N.W.2d 78, 81; Smith v. J. C. Penney Co. (1967), 260 Iowa 573, 585–586, 149 N.W.2d 794, 801; Meader v. Paetz Grocery Co. (1966), 259 Iowa 1101, 1106–1107, 147 N.W.2d 211, 215. See also Ling v. Hosts, Inc. (Iowa, 1969), 164 N.W.2d 123, 127.

■ It would serve no purpose to analyze the cases in which it has been applied. We are of the opinion that the facts here are typical of those intended to be covered by restatement rule 343. Plaintiff testified he thought the structure was a loading dock. He looked at the surface and determined the crusted grease was rough concrete. The jury could properly find the appearance was deceptive. It could also find that the conditions were such that an ordinary reasonable prudent man would not appreciate the danger and the situation presented a trap or pitfall to him. Defendant knew of the existence of the conditions and the appearance of the surface of the material. It was for the jury to decide whether defendant acting reasonably should have anticipated that a reasonable person in looking at the surface of the material in the vat would fail to recognize its nature, appreciate the danger it presented and would fail to protect himself from such danger.

■ III. Defendant in urging his claim that plaintiff was guilty of contributory negligence as a matter of law is confronted with the onerous burden of satisfying two often repeated rules:

(1) Contributory negligence will be decided as a matter of law only in the exceptional case in which such negligence is so palpable, flagrant and manifest that reasonable minds may fairly reach no other conclusion. Pastour v. Kolb Hardware, Inc. (Iowa, 1969), 173 N.W.2d 116, 124; Giarratano v. Weitz Co. (1967), 259 Iowa

1292, 1309, 147 N.W.2d 824, 835; R.C.P. 344(f) (10).

(2) It is seldom proper, in the absence of an admission, for the court to instruct the jury that a party with the burden of proof has established his claim as a matter of law. Nassif v. Pipkin (Iowa, 1970), 178 N.W.2d 334, 336–337, and citations; Markman v. Hoefer (1960), 252 Iowa 118, 127, 106 N.W.2d 59, 65, and citations.

This is not one of the exceptional cases in which the person has established the claim of contributory negligence as a matter of law.

▇▇ IV. Plaintiff asked for $50,000 damages. The jury after deliberating less than an hour and a half returned a verdict in his favor for the full amount of his prayer. The trial judge conditioned the granting of a new trial on the filing of a remittitur by plaintiff of all in excess of $35,000. Such remittitur was filed. Defendant on appeal claims the verdict was the result of passion and prejudice. He relies on the "extravagant damages" and the short period of deliberations on rather lengthy instructions and close factual situations for support.

The temperature of the liquid in the vat was 180° F. After plaintiff got out he removed most of his clothing. The skin from his arms and ankles peeled off with his clothing. His total skin surface was burned in varying degrees and at least one-half of his body sustained second and third degree burns. His doctor considered such burns over one-third of the body to be life threatening and gave him a "50–50" chance of survival.

His entire body was placed in a pressure wrapping which was changed two times during his stay in the hospital. He was given morphine but no anesthetic. Plaintiff suffered excruciating pain, particularly during each wrapping and unwrapping operation. He described the pain as being like that felt when he burned a finger in hot water extended to his whole body. The itching which accompanied the healing process increased his discomfort.

Plaintiff was discharged from the hospital after 16 days and returned to work for an hour or two after 20 days although still suffering pain. He began working full time six or seven weeks after the accident. He lost a total work time of slightly over four weeks.

He sustained permanent scarring to his right lower and lateral abdomen, right lateral thigh and his ankles. The hospital bill was $971, ambulance services $25, and the doctor's bill $340.

Plaintiff also testified his general health was not as good after his experience as it was before. He gets colds and flu more frequently. His feet bother him periodically. The doctor was not asked whether the burning would affect the general health.

The doctor described plaintiff as an "excellent patient, cooperative all the way through. He left the hospital much earlier than I thought was reasonable, returned to work a lot sooner than I felt was reasonable. He was extremely anxious to get back to work." He said plaintiff had a rather amazing and excellent recovery.

We fail to find any indication that the verdict was the result of passion and prejudice. Although plaintiff made an excellent recovery, his injuries were very serious and excruciatingly painful. The record does not disclose any untoward events or graphic evidence of the injuries which might tend to inflame or excite the jurors. Plaintiff's testimony indicated he was underplaying rather than overstating his suffering. The short period of deliberations alone does not indicate the jury failed to give the case careful and thoughtful consideration. As the trial court said: "It is entirely possible that all of the jurors were agreed upon liability at the outset of their deliberations. It is further possible they were not far apart on the amount of their verdict." Certain matters in the record by way of impeachment

which inhere in the verdict could have had a considerable effect on the question of liability. We do not believe defendant is entitled to a new trial on the claim that the verdict was governed by passion and prejudice.

Unless we exercise our inherent right to order a remittitur, Miller v. Young (Iowa, 1969), 168 N.W.2d 45, 53; Castner v. Wright (1964), 256 Iowa 638, 659, 127 N. W.2d 583, 128 N.W.2d 885, 886, the affirmance of the lower court on defendant's appeal results in the reinstatement of the original jury verdict of $50,000. Rule of Civil Procedure 250, Davis v. L & W Construction Company (Iowa, 1970), 176 N. W.2d 223, 228–229; Castner v. Wright (1964), supra, 256 Iowa at 659, 128 N.W. 2d at 886.

The $50,000 verdict was founded on $1336 for medical expenses and $846.16 loss of wages, the excruciating pain and discomfort which inevitably accompanies severe burns, 16 days of total disability in the hospital, four to five weeks of partial disability and minimal permanent injury consisting of scarring which does not affect his normal appearance. Plaintiff also testified to an undescribed periodic trouble with his feet and a change in his susceptibility to flu and colds. The doctor's evidence failed to mention the last matters.

Anyone who has undergone the painful experience of a serious burn on a small portion of his body has some conception of the excruciating pain to which this plaintiff was subjected. However, it was temporary and plaintiff's recovery was excellent with minimal permanent disability. This court, with the exception of the writer, believes there is substantial support in the record for the jury award of $50,000.

This case is affirmed and remanded for the setting aside of the judgment entered on the remittitur and the entry of judgment on the verdict.

Affirmed and remanded.

All Justices concur except BECKER, J., who concurs specially.

BECKER, Justice (concurring specially).

I concur in the result.

The status of persons coming on the premises of the occupier of land, as it affects liability, is germane to the issues herein considered. Although the matter about to be considered was not raised or argued, it would appear proper to review this subject in light of what was said and done by the Supreme Court of California in Rowland v. Christian, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968). In that case the court entirely discarded the fictitious common law distinctions based on the injured party's status as a trespasser, licensee, business invitee, social invitee and the like. I submit we should do likewise.

The Rowland case should be examined in its entirety but for the purpose of this special concurrence it is worthwhile to quote four selected paragraphs:

"One of the areas where this court and other courts have departed from the fundamental concept that a man is liable for injuries caused by his carelessness is with regard to the liability of a possessor of land for injuries to persons who have entered upon that land. It has been suggested that the special rules regarding liability of the possessor of land are due to historical considerations stemming from the high place which land has traditionally held in English and American thought, the dominance and prestige of the landowning class in England during the formative period of the rules governing the possessor's liability, and the heritage of feudalism. (2 Harper and James, The Law of Torts, supra, p. 1432.)

"The departure from the fundamental rule of liability for negligence has been accomplished by classifying the plaintiff either as a trespasser, licensee, or invitee and then adopting special rules as to the duty owed by the possessor to each of the

classifications. Generally speaking a trespasser is a person who enters or remains upon land of another without a privilege to do so; a licensee is a person like a social guest who is not an invitee and who is privileged to enter or remain upon land by virtue of the possessor's consent, and an invitee is a business visitor who is invited or permitted to enter or remain on the land for a purpose directly or indirectly connected with business dealings between them. (Oettinger v. Stewart, 24 Cal.2d 133, 136, 148 P.2d 19, 156 A.L.R. 1221.)

"A man's life. or limb does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without a business purpose. Reasonable people do not ordinarily vary their conduct depending upon such matters, and to focus upon the status of the injured party as a trespasser, licensee, or invitee in order to determine the question whether the landowner has a duty of care, is contrary to our modern social mores and humanitarian values. The common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty.

" * * * The proper test to be applied to the liability of the possessor of land in accordance with section 1714 of the Civil Code is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others, and, although the plaintiff's status as a trespasser, licensee, or invitee may in the light of the facts giving rise to such status have some bearing on the question of liability, the status is not determinative." (loc.cit. 70 Cal.Rptr. 100, 104, 443 P.2d 564, 568.)

The California Code section merely codifies the general common law and does not create a meaningful distinction between the Iowa and California law. It should be noted that California recognizes the status of the injured party *has a bearing* on the question of liability. Thus the admissibility of evidence on this question is preserved but the rigid distinctions between parties, dependent on their status, is eliminated. This same enlightened action should be taken now by this court in Iowa.